FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

2016 NOV 15  PM 3: 56

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

TONY D. NELSON

Case No:      3:16-cv-1434-J-32UBST

v.                                                    [MDF Case No:  3:10-cr-23-J-32TEM]

UNITED STATES OF AMERICA

_____/

**TONY D. NELSON'S**
**PETITION FOR WRIT OF ERROR CORAM NOBIS**
**AND**
**INCORPORATED MEMORANDUM OF LAW**

Defendant, Tony D. Nelson, by and through his undersigned counsel, pursuant to the Writ

of Error *Coram Nobis* (hereinafter "Writ" or "*Coram Nobis*"), that is, the All Writs Act (28 U.S.C.

§1651), and *United States v. Morgan*, 346 U.S. 502, 506 n.6 (1953), and the additional authorities

set forth herein, respectfully requests this Honorable Court vacate his judgment, conviction and

sentence, and vacate any orders of assessments, forfeiture and/or personal money judgments, and in

support hereof, states as follows:

**TABLE OF CONTENTS**

Page
A.    Introduction and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
B.    *McDonnell* Decision – Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
C.    Application of *McDonnell* Decision to Nelson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    (1)   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    (2)   Indictment – Required Proof Bribe was to Influence Nelson's "Official Duties" 18
    (3)   Indictment – Defective "Access" Theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    (4)   Jury Instructions – Constitutional and *McDonnell* Defects . . . . . . . . . . . . . . . 22
    (5)   "Access" – 6 Claims – No "Decision" or "Action" . . . . . . . . . . . . . . . . . . . . . 33
    (6)   *Quid Pro Quo* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    (7)   Federalism and the Florida Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
    (8)   Application of *McDonnell* to All Counts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
D.    *Coram Nobis* Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
E.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## PETITION AND MEMORANDUM

A.    Introduction and Procedural History

1.    The United States Supreme Court recently rendered its decision in *McDonnell v. United States*, 579 U.S. __, 136 S.Ct. 2355 (2016) (No. 15-474, slip op. – which will be cited herein), addressing the constitutional and due process reach of the federal mail fraud honest services statute, founded on alleged bribery of a public official.  Respectfully, based on that decision, Mr. Nelson's convictions should be set aside, under the *coram nobis* jurisdiction of this Court.[1]

2.    The holdings of *McDonnell* and their application to Mr. Nelson will be addressed in Parts B and C, respectively.  In summary, the Supreme Court has prohibited convictions of public officials based on a government theory that such officials provided access to themselves, or their staff, for the benefit of the alleged bribe-payor.  Instead, actual official acts must be performed, or promised to be performed, and a *quid pro quo* must exist.[2] Merely meeting, taking or making phone calls, or engaging in personal conversations (that is, the very conduct alleged against Mr. Nelson), are actions that lie outside the permissible constitutional reach of the honest services mail fraud statute.

3.    Mr. Nelson was convicted, after jury trial, on May 20, 2011, of various charges of (1) conspiracy to commit honest services mail fraud (by "bribery"), bribery and money laundering (18 U.S.C. §371), (2) mail fraud (bribery) (18 U.S.C. §1341, 1346), (3) money laundering (18 U.S.C. §1956), (4) soliciting and accepting a bribe (18 U.S.C. §666), and making a false statement to the

---

[1] The *coram nobis* jurisdiction of this Court will be addressed in Part D, *infra*.  Such writs are available, *inter alia*, to "achieve justice" and set aside constitutionally infirm convictions.

[2] As noted in ¶104, *infra*, the government concedes they did not prove the existence of any *quid pro quo* in Nelson.

FBI (18 U.S.C. §1001).  Doc. 408.  All government theories were predicated on the defective "bribery" claims.[3]

4.      Both Nelson's post-trial motion for judgment of acquittal ("JOA") (Doc. 306), as well as his other post-trial motions, were denied.  Doc. 364.

5.      The gravamen of Mr. Nelson's trial defenses, his JOA grounds, and his appellate grounds, were that, as a non-paid, part-time, appointed public official, under Florida law, (1) allowing "access" to himself was not a constitutionally permissible basis to support an honest services bribery prosecution, (2) Nelson never took any "official action" on behalf of Mr. Young, and (3) that, although vigorously disputing he ever did so, even if he did, he was lawfully permitted to lobby his own agency – the Jacksonville Port Authority ("JPA") – unless he voted on a matter relevant to his alleged lobbying.[4]  However, it is undisputed Nelson never voted, and thus he never took any prohibited "official action" in exchange for the alleged "bribe" Lance Young claimed to have paid him.[5]  Mr. Nelson's requests for jury instructions, requiring the jury to find the existence of an "official action," were denied.  See Part C(4), *infra*.

6.      Mr. Nelson was sentenced to 40 months of incarceration, followed by one year of

---

[3] As such, all counts are subject to vacation, under *McDonnell* – not just the defective mail fraud and §666 "bribery" counts.  See Part C, subpart (8), ¶115-119, entitled. "Application of *McDonnell* to All Counts."

[4] The evidence is undisputed Mr. Nelson was permitted to do so by (1) State law, (2) his agency's rules and regulations (Ex. B), and (3) the advice and instruction of the General Counsel for his own agency (Ex. A) – all of which expressly legalized any lobbying activities – even as to his own agency.

[5] The payments, of course, were actually lawful consulting fees, paid monthly, pursuant to a written consulting agreement (Nelson Exs. 7A, 7B), which income was reported, and on which taxes were paid, and for which Mr. Nelson performed a tremendous amount of consulting work.

supervised release. Doc. 408. He has now completed all components of his sentence.[6]

7.      Mr. Nelson's appeal to the 11th Circuit was supported by both the National Association of Criminal Defense Lawyers ("NACDL") and the American Civil Liberties Union ("ACLU"), who filed a joint amicus brief (a copy of which is attached as Exhibit D), supporting Mr. Nelson's due process and notice arguments (which are the same arguments set forth herein, which have now been fully recognized by the *McDonnell* decision). However, Mr. Nelson's appeal was denied, in a 2-1 decision, on March 13, 2013, in Case No. 12-11066. *United States v. Nelson*, 712 F.3d 498 (11th Cir. 2013).[7] His petition for certiorari to the United States Supreme Court was denied.

8.      On June 27, 2016, the United States Supreme Court rendered its decision in *McDonnell v. United States*. As discussed in Parts B and C, *infra*, that unanimous decision conclusively demonstrates that Mr. Nelson was improperly convicted, and the remedy sought herein should be granted. As those Parts B and C will demonstrate, *McDonnell* supports Mr. Nelson's requested relief in a number of ways. Among those ways are (1) the failure of proof and absence of jury instructions requiring the jury to find that Mr. Nelson committed (or agreed to commit) an "official act" in exchange for the monthly consulting fee he received – especially since the Nelson Indictment asserted he would demand the "**bribe**" "in return for being influenced in the performance

---

[6]   Mr. Nelson was imposed a $3,600 Special Assessment (Doc. 408 at 5), as well as a Forfeiture Money Judgment (Doc. 413) in the amount of $143,500 (Docs. 453 and 457).

[7]   The dissenting opinion of Justice Hill concluded Mr. Nelson had not committed a crime at all. In addition, Justice Hill noted the absence of either proof of a *quid pro quo*, as well as the government's admission no such proof was offered. Importantly, Justice Hill, expressing the very federalism concerns now underpinning *McDonnell*, noted that Florida law permitted Mr. Nelson to do that which the government accused him of, thus making Nelson's conduct lawful.

of his **official duties**" (Indictment – Doc. 1, "Manner and Means," at 5, ¶¶C.1 and C.2.); (2) resting a bribery conviction on a theory merely relying on "access" (such as mere meetings, or phone calls, where no official or "agent" action took place, such as a vote, or agency decision); and (3) contravening the principles of "federalism," which, as applied to Mr. Nelson, barred his conviction, since, under Florida law, he had plenary authority to lobby his own agency (assuming he had done so).

9.     Mr. Nelson is mindful, and will discuss in greater detail below, that *McDonnell* specifically addressed §201 bribery as the predicate "bribery," when reviewing the *McDonnell* honest services conviction.  However, since, as noted in the preceding paragraph, the entire "Manner and Means" of the Nelson Indictment rested on the government theory that Nelson would "demand and accept **bribe** money ... in return for being influenced in the performance of his **official duties**,"[8] the Nelson Indictment, by its own definition, is equally governed by the *McDonnell* holdings.  Clearly, the "official duties" the Indictment asserted Mr. Nelson performed involved <u>acts</u> he would have to take, "in the performance of his **official duties**."  "Acts" undertaken in the performance of one's "official duties" (the Indictment term) then clearly become "official acts" – which is precisely the term analyzed in *McDonnell*.  Moreover, the act required of an "agent" under §666 likewise required that agent to act in his official capacity.  Lastly, the Nelson jury instructions informed the jury that the "right to honest services" fraud alleged was that the "scheme or plan consisted of a <u>bribe</u>."  Jury Instruction No. 14 (Doc. 333).  Hence, by the government's own theory of prosecution, it has inherited the holdings of *McDonnell* in its prosecution of Mr. Nelson.

10.     In reviewing this Petition, this Honorable Court is respectfully requested to note the

---

[8]   Indictment – Doc. 1, "Manner and Means," at 5, ¶¶C.1 and C.2.

*McDonnell* decision involved an <u>elected</u> Governor of the State of Virginia. The Supreme Court, having unanimously determined the elected and compensated <u>Governor's</u> due process rights were violated in his bribery prosecution, *a fortiori*, it is clear the rights of Mr. Nelson, as merely an appointed, voluntary, part-time, uncompensated member of the JPA Board, have been violated, and he was incorrectly convicted. That is all the more so, given the esoteric "access" theory of bribery applied by the government to the prosecution of Nelson – a theory soundly rejected by *McDonnell*.

B.  *McDonnell* Decision – Analysis

11.  The former Governor of Virginia, Robert McDonnell, was indicted on honest services fraud and extortion charges,[9] related to his acceptance of some $175,000 in loans, gifts and other benefits from a Virginia businessman, Johnnie Williams, while Governor McDonnell was in office.[10] Thus, Mr. Nelson was charged with and convicted of identical honest services (bribery) charges, such that the holding of *McDonnell* case clearly applies to him.

12.  To convict the governor, the government was required to show that Governor McDonnell committed (or agreed to commit) an "official act" in exchange for the loans and gifts. An "official act" is defined as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such officials' place of trust or profit." 18

---

[9] Governor McDonnell was charged with "one count of conspiracy to commit honest services fraud [18 U.S.C. §§1341, 1349], three counts of honest services fraud [18 U.S.C. §1341], one count of conspiracy to commit Hobbs Act extortion [18 U.S.C. §1951(a)], and two counts of making a false statement [18 U.S.C. §1014]." *McDonnell* at 8.

[10] Williams was the CEO of Star Scientific, a Virginia-based company that had developed Anatabloc, a nutritional supplement made from anatabine, a compound found in tobacco. Star Scientific wanted Virginia's public universities to perform research studies on anatabine, and Williams wanted Governor McDonnell's assistance in obtaining those studies.

U.S.C. §201(a)(3).  According to the government, the governor committed at least five "official acts," including "arranging meetings" for Williams with other Virginia officials to discuss Star Scientific's product, "hosting" events for Star Scientific at the Governor's Mansion, and "contacting other government officials" concerning research studies.  *McDonnell* at 1.[11]

13.     The McDonnell jury was instructed that the term "official act" encompasses "acts that a public official customarily performs,"[12] including acts "in furtherance of longer-term goals" or "in a series of steps to exercise influence or achieve an end." *McDonnell* at 11 (emphasis added).[13]

14.     Governor McDonnell moved for acquittal and vacation of his convictions, on the ground that the definition of "official act" in the jury instructions was erroneous.  The Supreme Court agreed – unanimously.

15.     In light of the due process strictures mandated by *Skilling*,[14] the government, in Nelson, was required to attempt to pigeon hole the "honest services" fraud alleged against Nelson

---

[11] As can be seen, these purported "official acts" were, in essence, identical in nature to those advocated by the government in Mr. Nelson's case.  Hence, they are likewise legally insufficient, as will be discussed in detail in Part C.(3) and C.(5), *infra*.

[12] As discussed below, Nelson's request for an instruction, informing the jury of his "official duties," was denied – notwithstanding the fact the Indictment specifically asserted the "Manner and Means" by which the honest services fraud was perpetrated was that Nelson would demand the "bribe" "in return for being influenced in the performance of his **official duties**."  Indictment at 5, ¶C.2.  Repeatedly, the Indictment asserted the payments to Nelson were demanded by Nelson "in return for being influenced in the performance of his **official duties**."  Indictment at 7 and 14, ¶D.1 and 2, and ¶D.35.

[13] This instruction, found defective by the Supreme Court, was essentially the same instruction given to the Nelson jury.  Nelson Jury Instruction No. 14 (Doc. 333) permitted a conviction for bribery if "Nelson intended to be corruptly influenced or rewarded for a transaction or series of transactions of the Jacksonville Port Authority."  The Nelson term, "transaction or series of transactions," was essentially the same as the "series of steps" term found defective in *McDonnell*.

[14] *Skilling v. United States*, 561 U.S. 358 (2010).

by asserting that the honest services fraud was committed by <u>bribery</u>.[15]  Hence, Nelson could not have been properly convicted in the absence of proof of bribery.  Thus, *McDonnell*'s bribery holdings are controlling.

16.     *McDonnell* held there were two requirements for an "official act."  First, the government must identify a "question, matter, cause, suit, proceeding or controversy" that "may at any time be pending" or "may by law be brought" before a public official.  Second, the government must prove that the public official made a decision or took an action "on" that "question, matter, cause, suit, proceeding or controversy," or agreed to do so.  *Id.* at 14.

17.     As to the first element required to establish an "official act," the Supreme Court concluded that, "the terms 'question, matter, cause, suit, proceeding or controversy' do not sweep so broadly" as to encompass "a typical meeting, call or event."  *Id.* at 14-15.

18.     In the Nelson prosecution, the government's theory regarding the first prong of the bribery element was that Mr. Nelson provided "access" for Mr. Young (SSI) to Nelson.[16]  However, the "access" proof (as discussed in Part C.(5), *infra*) involved no more than the "typical meeting, or event," which *McDonnell* determined would normally <u>not</u> qualify.

---

[15]  Jury Instruction No. 14 (Doc. 333) informed the jury that the "right to honest services" fraud alleged was that the "scheme or plan consisted of a <u>bribe</u>."  Indeed, all of the instructions informed the jury the predicate crime was bribery.

[16]  The government explicated their "access" theory in the Lance Young Plea Agreement, Doc. 15, Case 3:10-cr-00030-TJC-MCR at 24.  It was their <u>only</u> "bribery" theory at trial.  Indeed, in denying Nelson's JOA motion, this Court confirmed the government relied on this "access" theory, stating that, "While the Court agrees that the evidence that Mr. Nelson corruptly provided improper <u>access</u> or favor to Young's company, SSI, at the Port was circumstantial and subject to debate ... it was nevertheless sufficient for the jury to accept."  Doc. 364 at 4.  Pursuant to *McDonnell*, such "access" evidence and theory is constitutionally deficient, and could never properly support a jury verdict – especially where even that meager evidence was "circumstantial and subject to debate."

19.     Given the holding that "a typical meeting, call, or event is not itself a question or matter," the Supreme Court concluded that "the next step is to determine whether arranging a meeting, contacting another official, or hosting an event may qualify as a 'decision or action' *on* a different question or matter." *Id.* at 16-17. That, in turn, required the Court to "first establish what counts as a question or matter in this case." *Id.* at 17. Mr. Nelson will undertake that same analysis in Part C.(5), below.

20.     In *McDonnell*, the Court addressed the three "questions or matters" urged by the government to support its claim that those events qualified as a "decision or action." The three questions or matters were as follows: (1) whether researchers at Virginia's state universities would initiate a study of Anatabloc; (2) whether Virginia's Tobacco Commission would allocate grant money for studying anatabine; and (3) whether Virginia's health plan for state employees would cover Anatabloc. *Id.* at 17-18.

21.     The Court concluded those three matters did "qualify as questions or matters under §201(a)(3)." *Id.* at 18. (Conversely, no such official "questions or matters" existed in the Nelson allegations.) However, that conclusion only resolved the first element of the two requirements for establishing an "official act." Thus, the Supreme Court stated,

> The question remains whether – as the Government argues – merely setting up a meeting, hosting an event, or calling another official qualifies as a decision or action on any of those three questions or matters. Although the word "decision," and especially the word "action," could be read expansively to support the Government's view, our opinion in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), rejects that interpretation.

*Id.* at 18.

22.     By adopting a "more limited definition of 'official acts'" (*id.* at 18), the Supreme

Court stated,

> It is apparent from *Sun-Diamond* that hosting an event, meeting with other officials, or speaking with interested parties is not, standing alone, a "decision or action" within the meaning of §201(a)(3), even if the event, meeting, or speech is related to a pending question or matter. Instead, something more is required: §201(a)(3) specifies that the public official must <u>make a decision</u> or <u>take an action</u> *on* that question or matter, or <u>agree to do so</u>.

*Id.* at 19 (emphasis added).

23.      As will be demonstrated in Part C.(5) below, and as the record clearly establishes, Mr. Nelson made <u>no decision whatsoever</u>. Thus, his convictions cannot stand.

24.      Alternatively, the requisite <u>decision</u> or taking of action can be established by a public official "using his official position to exert pressure on *another* official to perform an 'official act.'" *Id.* at 19. Again, no such evidence exists in Mr. Nelson's case, as will also be demonstrated in Part C.(5) below. This is all the more so, since it remains a requirement that such "pressure" must "form the basis for an 'official act' by another official." *Id* at 21. No such basis, or official act, exists in the constitutionally vague "access" claims relied upon by the government in the Nelson case.

25.      The Supreme Court founded its decision on bedrock constitutional principles, finding that "the Government's expansive interpretation of 'official act' would raise significant constitutional concerns." *Id.* at 22.

26.      In addition, the Supreme Court held that, "Section 201 prohibits *quid pro quo* corruption – the exchange of a thing of value for an 'official act.'" *Id.* at 22. However, in the Nelson prosecution, the government incorrectly urged that no *quid pro quo* was required. They also incorrectly urged that on appeal. Thus, Nelson was also improperly convicted without proof or jury

instructions requiring a *quid pro quo*.[17]

27.     The Supreme Court rejected the expansive application by the government of the terms "*quid*" and "*quo*," noting that,

> White House counsel who worked in every administration from that of President Reagan to President Obama warn that the Government's "breathtaking expansion of public-corruption law would likely chill federal officials' interactions with the people they serve and thus damage their ability effectively to perform their duties."

*Id.* at 22-23.

28.     Because the Supreme Court determined that "breathtaking expansion of public-corruption law" concern to be "substantial," it reiterated that,

> The Court in *Sun-Diamond* declined to rely on "the Government's discretion" to protect against overzealous prosecutions under §201, concluding instead that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."

*Id.* at 23 (citing *Sun-Diamond*, 526 U.S., at 408, 412).

29.     Nelson repeatedly raised the *Skilling* due process issues in his case, objecting to the government's attempt to incorrectly cast his mere "access" conduct as bribery. In *McDonnell*, the Supreme Court questioned whether, with its *Skilling* decision, it should have abrogated honest services prosecutions in their entirety, but concluded that limiting them to bribery and kickbacks should be sufficient to eliminate the government's efforts to misapply this statute. However, they readily concluded in *McDonnell* that their effort to constrain the overreaching conduct of the

---

[17] *United States v. Siegelman*, 640 F.3d 1159, 1170-71 (11th Cir. 2011), a §666 bribery case, also concluded that a quid pro quo <u>was</u> required, which meant an explicit promise to perform an official act, and the payment must be for some <u>specific</u> official action. "No generalized expectation of some future favorable action will do." *Id.* Indeed, *Siegelman* required (as does *McDonnell*) that the "payment was made in return for <u>official acts</u>." *Id.* (emphasis added).

government had been unsuccessful, and thus rendered this decision, further restricting the government's "overzealous prosecutions." *Id.* at 23.

30.     In addressing the "standardless sweep" of the government's reading of the bribery statute, the Supreme Court, in *McDonnell*, stated as follows:

> A related concern is that, under the Government's interpretation, the term "official act" is not defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," or "in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 561 U.S., at 402-403 (internal quotation marks omitted).     Under the "'standardless sweep'" of the Government's reading, *Kolender v. Lawson*, 461 U.S. 352, 358 (1983), public officials could be subject to prosecution, without fair notice, for the most prosaic interactions. "Invoking so shapeless a provision to condemn someone to prison" for up to 15 years raises the serious concern that the provision "does not comport with the Constitution's guarantee of due process." *Johnson v. United States*, 576 U.S. ___, ___ (2015) (slip op., at 10). Our more constrained interpretation of §201(a)(3) avoids this "vagueness shoal." *Skilling*, 561 U.S., at 368.

*Id.* at 24.

31.     That language could not possibly be more applicable to Mr. Nelson, who most assuredly had no "fair notice" and could not have fathomed that his conduct – <u>fully authorized by Florida Statute and the Office of General Counsel</u> – would be criminalized by the government's "standardless sweep" of the honest services statute, relying on claims of "bribery" – but founded only in "access" facts.

32.     The constitutional Due Process concerns expressed in *McDonnell* were a corollary to the Supreme Court's concern that the "Government's position also raises significant federalism concerns," noting that states have the "prerogative to regulate the permissible scope of interactions between state officials and their constituents." *Id.* at 24.  Hence, the Supreme Court gave great

12

deference to allowing local and state governments to set standards for their own public officials, stating as follows:

> Here, where a more limited interpretation of "official act" is supported by both text and precedent, we decline to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards" of "good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 (1987); *see also United States v. Enmons*, 410 U.S. 396, 410-411 (1973) (rejecting a "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States").

*Id.* at 24.

33.     This holding by the Supreme Court is incredibly applicable to Mr. Nelson. As the record fully demonstrates, it is undisputed that, under Florida law, Mr. Nelson was entitled allow Young to have "access" to him, and to <u>lobby</u> his <u>own agency</u> (even though he did <u>not</u> do so in this case) – unless he <u>voted</u> (which he did not do). The voting conflict form that was admitted in the Nelson case (Nelson Ex. 4A – Tab D), a copy of which is attached hereto as Exhibit B, as well as its predicate Florida Statute § 112.3143(4), both established that, under Florida law, it was absolutely <u>lawful</u> for an <u>appointed</u> official (such as Mr. Nelson) to "participate" in any matter before his <u>own</u> agency, and "attempt to <u>influence</u> the decision" of his agency – as long as he abstains from voting, and completes the Voting Conflict Form.[18]

34.     Clearly, it is undisputed the State of Florida set the conduct standards for Mr. Nelson.

---

[18] As noted, there was <u>never any vote</u> in which Nelson participated, and, if there had been, the sanction was purely civil – not criminal. Thus, his interaction with Young was protected from the government's "unprecedented invasion into the criminal jurisdiction of the States" (*McDonnell* at 24) by no fewer than four measures:  (1) he was lawfully entitled to lobby the JPA – by Florida statute (Ex. B), (2) he was so informed and specifically so advised by the Office of General Counsel – who were his attorneys (Orientation Manual – Exhibit A hereto), (3) he did not vote, and (4) if he had voted, his state sanctions would have been administrative – not criminal.

The *McDonnell* decision declined to allow the federal government to set those standards. However, in the Nelson case, the government requested the Court instruct the jury that "the duty of a public official or employee to provide honest services to the public is established by federal law." Court's Instructions to the Jury (Doc. 333), at 24 (emphasis added). Thus, the jury was instructed with precisely the opposite authority set forth in *McDonnell*. Moreover, the multiple requests of Mr. Nelson that the jury be instructed that his conduct was lawful under state law were rejected, as were the jury instructions he submitted documenting that request. Doc. 240 (see e.g. pp. 13-14 and 20). Thus, the jury was permitted to convict Mr. Nelson for acts that were perfectly lawful, and the jury was never informed the State of Florida, in exercising its "prerogative to regulate the permissible scope of interactions between state officials and their constituents" (*McDonnell* at 24), had fully authorized Mr. Nelson to conduct himself in a manner the federal government sought to criminalize.

35.     Just as with Mr. Nelson, the Supreme Court found the McDonnell "jury was improperly instructed on the meaning of 'official act.'" *Id.* at 24. The Supreme Court found three fatal defects in those jury instructions.

36.     "First, the instructions did not adequately explain to the jury how to identify the 'question, matter, cause, suit, proceeding or controversy.'" *Id.* at 25. The same is true of the Nelson jury instructions. Indeed, the *McDonnell* defect was compounded by virtue of the Nelson instructions not only failing to define that statutory term, but utilizing the same defective definition of a question or matter as being a "transaction or series of transactions." Jury Instruction No. 14 (Doc. 333), element 2. Nor was the jury instructed "that it must identify the 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power." *Id.* at 25 (emphasis added). Again, the Nelson jury was left with nothing more than the entirely nebulous and

14

constitutionally defective ability to convict Mr. Nelson, based on a "transaction or series of transactions," which, in turn, were grounded in an "access" theory rejected by *McDonnell*. No "sound exercise of governmental power," or Mr. Nelson engaging in "official acts" to exercise the "official duties" charged in his Indictment, was required to convict.

37.     The Supreme Court further addressed the deficiencies of the jury instructions, stating, "Second, the instructions did not inform the jury that the 'question, matter, cause, suit, proceeding or controversy' must be more specific and focused than a broad policy objective." *Id.* at 26. The instructions in Nelson and the government's "access" argument were equally nebulous. The Supreme Court noted that the jury should have been instructed that,

> the pertinent "question, matter, cause, suit, proceeding or controversy" must be something specific and focused that is "pending" or "may by law be brought before any public official," such as the question whether to initiate the research studies.

*Id.* at 26.

38.     Mr. Nelson received no such instruction requiring specificity as to the alleged question or matter.

39.     Lastly, in what is surely the most fatal defect in Mr. Nelson's convictions (from the perspective of the jury instructions – apart and aside from the federalism violations), the Supreme Court found the following as the third defect in the jury instructions:

> Third, the District Court did not instruct the jury that to convict Governor McDonnell, it had to find that he made a decision or took an action – or agreed to do so – on the identified "question, matter, cause, suit, proceeding or controversy," as we have construed that requirement.

*Id.* at 26 (underlined emphasis added).

40.     In the Nelson case, the jury was never instructed – at all – that they were required to find that Mr. Nelson "made a decision or took an action – or agreed to do so."[19]

41.     No conviction of Mr. Nelson could lie where "he did not agree to make a decision or take an action on any of the ... questions or matters" involving "access" relied upon by the government. *Id.* at 26. Indeed, to prevent an improper conviction, the Supreme Court noted that the *McDonnell* jury should have been instructed that "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 27.[20]

42.     The Supreme Court thus concluded that, "because the jury was not correctly instructed on the meaning of 'official act,' it may have convicted Governor McDonnell for conduct that is not unlawful." *Id.* at 27. The same must be said of the Nelson jury – and with far greater strength – in light of the Florida law that governed Mr. Nelson's duties. Moreover, the Supreme Court concluded that those were <u>not</u> errors that were "harmless beyond a reasonable doubt." *Id.* The same must be said, with exponentially greater strength, about Mr. Nelson.

43.     With this backdrop on the constitutional underpinnings of *McDonnell* – all of which apply (with even greater strength) to Mr. Nelson – the next Part C will provide additional comments regarding the application of the *McDonnell* decision to the "access" theory of prosecution applied to Mr. Nelson.

---

[19]   Of course, even if that instruction had been given, Mr. Nelson's conviction would have remained defective, in the absence of the jury being informed that, under Florida law, he was absolutely entitled to "attempt to influence the decision" of his own agency – as long as he abstained from voting. Florida Statute §112.3143(4).

[20]   As discussed in Part C.(4), consistent with the constitutional requirements in *McDonnell*, Nelson submitted multiple jury instructions, requesting the jury be informed he could lawfully lobby his <u>own</u> agency, attend meetings, and have discussions with JPA staff. Nelson's Supplemental Proposed Jury Instructions Nos. 4 and 9 (Doc. 240 at 12-15 and 19-21). These requests were denied.

C.     Application of *McDonnell* Decision to Nelson

(1)     Introduction

44.     The application of *McDonnell* to Mr. Nelson starts with an analysis of the charges contained in the *McDonnell* indictment.  As noted in note 9, *supra*, Governor McDonnell was charged with "one count of conspiracy to commit honest services fraud [18 U.S.C. §§1341, 1349], three counts of honest services fraud [18 U.S.C. §1341], one count of conspiracy to commit Hobbs Act extortion [18 U.S.C. §1951(a)], and two counts of making a false statement [18 U.S.C. §1014]." *McDonnell* at 8.  As can be seen, the gravamen of Governor McDonnell's indictment was the honest services fraud conspiracy (founded in the alleged claim he "accepted bribes" – *McDonnell* at 9), and its parallel substantive counts, is precisely the gravamen of the Nelson indictment.

45.     Similarly, the *McDonnell* Hobbs Act charges were parallel to the Nelson §666 "bribery concerning programs receiving Federal funds" counts. The Hobbs Act proscribes a demand of a bribe (extortion) "under color of official right."  18 U.S.C. §1951(b)(2). The federal program "bribery" statute likewise requires the bribery demand be made by an official "agent" of an organization, who is "authorized to act on behalf of ... [that] organization."  18 U.S.C. §666(a)(1) and (d)(1). Clearly, the §666 defendant is acting under "color of official right" as the official "agent" of the organization "authorized to act on behalf of ... [that] organization."

46.     Of course, the clear parallels in the Nelson and *McDonnell* counts, while significant, are no less significant than the due process mandates of *Skilling*, and now *McDonnell*.  The entire purpose of *Skilling* was to rein in the unbridled exercise of prosecutorial discretion in the use of the honest services statute – and restrict it to either bribery or kickbacks.  Regardless of the statutory "bribery" vehicle used by the government to purportedly comply with the due process mandates of

*Skilling* (such as §201, §1951 or §666), the government must prove a real bribery, involving a real exercise of the official right, authority and <u>acts</u> of the public official defendant.  As demonstrated herein, the government, in Nelson, could never meet that due process requirement, since their entire prosecution theory was grounded in their defective "access" theory.  Indeed, as demonstrated in Part C (5), *infra* (captioned: "Access" – 6 Claims – No "Decision" or "Action"), even as simply a factual matter, the alleged "access" proof failed to meet constitutional muster.

     (2)     <u>Indictment – Required Proof Bribe was to Influence Nelson's "Official Duties"</u>

     47.     As noted above, the Nelson Indictment asserted he would demand the "**<u>bribe</u>**" "in return for being influenced in the performance of his **<u>official duties</u>**."  Indictment – Doc. 1, "Manner and Means," at 5, ¶¶C.1 and C.2.  Repeatedly, the Indictment asserted the payments to Nelson were demanded by Nelson "in return for being influenced in the performance of his **<u>official duties</u>**."  Indictment (Doc. 1) at 7 and 14, ¶D.1 and 2, and ¶D.35.

     48.     This Honorable Court quoted these very Indictment paragraphs (from both the Manner and Means and the overt acts sections of the Indictment – recited in ¶47, *supra*), in concluding the Indictment alleged a *quid pro quo*.  Doc. 120 at 6-7.  More to the point, regarding the application of *McDonnell* to Nelson, this Court relied on these very allegations of bribery, in which the bribe was taken "in return for being influenced in the performance of his **<u>official duties</u>**," to conclude the Indictment for "honest services mail fraud charges are sufficiently alleged under the law even post-<u>Skilling</u>."  *Id*. at 7.  Clearly, that finding of sufficiency of the Indictment rested squarely, and entirely, on the Indictment's allegation that the bribe was taken by Nelson "in return for being influenced in the performance of his **<u>official duties</u>**."  *Id*. at 6-7.[21]

---

[21] In rendering that finding, this Court gave the Indictment a common sense construction, as it must.  *United States v. Drew*, 722 F.2d 551, 552-53 (9th Cir. 1983).  That same common sense

49.     Having held the "official duties" allegations of the Indictment were essential to maintaining a prosecution for honest services mail fraud, this Honorable Court has confirmed that which the Indictment alleged – that no honest services bribery crime could be committed, in the absence of proof Mr. Nelson received the "bribe" "in return for being influenced in the performance of his **official duties**." Since that allegation was the basis of the *McDonnell* analysis, the due process analysis of *McDonnell*, regarding the reach of the honest services bribery mail fraud statute, applies with equal strength to Mr. Nelson. Thus, any analysis of whether his "official duties" and "official acts" transgressed the honest services bribery mail fraud statute must apply the due process limits set by *McDonnell*.

50.     The entire purpose of *McDonnell* was to determine the scope of honest services bribery prosecutions under the mail fraud statute. Here, this Court has already held the Nelson Indictment properly charged an honest services bribery count – but only based on the express reason the Indictment actually alleged (as it must, under *Skilling*, as this Court noted) Mr. Nelson took the "bribe" – "in return for being influenced in the performance of his **official duties**."

51.     Obviously, and intuitively, the "official duties" the Indictment asserted Mr. Nelson performed involved <u>acts</u> he would have to take, "in the performance of his **official duties**."[22] "Acts" undertaken in the performance of one's "official duties" (the Nelson Indictment term) then clearly become "official acts" – which is precisely the term analyzed in *McDonnell*. Hence, by the government's own theory of prosecution, it is bound by the holdings of *McDonnell* in its prosecution construction must now inform and guide this Honorable Court when evaluating the application of the *McDonnell* holding to Nelson.

---

[22]   Indeed, the Indictment specifically asserted those "acts" in its Overt Acts section. Indictment (Doc. 1) at 7 and 14, ¶D.1 and 2, and ¶D.35.

of Mr. Nelson.

52.    As noted, this Honorable Court relied on the express language of the Indictment in ascertaining it properly charged (post-*Skilling*) an honest services bribery mail fraud.  Mr. Nelson was, and is, entitled to that same reliance, and its application to the holdings of *McDonnell*.

53.    Rule 7(c), Fed. R. Crim. P. provides as follows:

> The indictment ... <u>must</u> be a plain, concise, and definite written statement of the <u>essential facts</u> constituting the offense charged ... A count may allege ... that the defendant committed [the offense] by one or more specified <u>means</u>.

(emphasis added).[23]

54.    As noted, consistent with the requirements of Rule 7(c), this Honorable Court has already held the "essential facts" and "means" set forth in the Nelson Indictment specifically alleged Mr. Nelson took bribes "in the performance of his **official duties**" – as the basis for the honest services bribery mail fraud charges.[24]

55.    Having unequivocally asserted the bribery to be to influence Nelson's <u>official duties</u>, it was incumbent on the government to prove those "essential facts" and "means." Rule 7(c), Fed. R. Crim. P., and this Court's prior holdings, mandated such proof.[25]

---

[23]    This unambiguous requirement of the Rules of Criminal Procedure is oft-recited by countless cases. *See*, *Hamling v. United States*, 418 U.S. 87, 117 (1974) (statutory language must be accompanied with statement of facts and circumstances that will inform of the specific offense).

[24]    Indeed, an indictment alleging a mail fraud conspiracy is insufficient where he fails to allege a plan to defraud as required by case law.  *United States v. Yefsky*, 994 F.2d 885, 893-94 (1st Cir. 1993).  Here, as noted, in honoring that due process requirement, this Court found the Nelson indictment sufficient – but only because it complied with the post-*Skilling* requirement that any honest services bribery mail fraud charge allege bribery "in the performance of his official duties."  Doc. 120 at 7.

[25]    As noted by this Court, post-*Skilling*, this form of honest service bribery allegation was essential, in order for the government to state a cognizable cause of action.  However, even where

56.   Thus, notwithstanding the government's efforts to cast the bribery allegations under §666, the clear _factual_ allegations of the Indictment, and the holdings of this Court, confirm the "official acts" due process analysis of _McDonnell_ apply with equal strength to Mr. Nelson.

57.   Nor can the government be permitted to, after-the-fact, abandon their express reliance on its honest services bribery fraud theory, requiring that Mr. Nelson took bribes "in the performance of his **official duties**." To do so would create an additional error of constitutional magnitude.[26]

(3)   Indictment – Defective "Access" Theory

58.   As noted, post _Skilling_, the government sought to support its honest services fraud prosecution by urging that Mr. Nelson violated the statute by _bribery_ conduct. However, rather than prove any common notion of "bribery," the government applied a far more nebulous and constitutionally defective theory of bribery, asserting that "Nelson provided special 'access' and assistance to YOUNG at JaxPort."[27] To advance that theory of prosecution, the government recited four instances of alleged "'access' and assistance" Nelson purportedly provided Young. _Id._ By the time of trial, that list of four had (improperly) expanded to six items, as will be discussed in Part C.(5) below.

59.   Regardless of the number of "access" items alleged, it cannot be gainsaid that, under _McDonnell_, the government's "access" theory of prosecution in this case was fatally flawed.

the government alleges elements _not_ required, they have the burden of proving that which they pled. _Jaben v. United States_, 349 F.2d 913, 915 (8th Cir. 1965). Here, of course, this "official duties" allegation was not a surplus element. Rather, as this Court held, it was essential to survive a _Skilling_ challenge.

[26]   "This roaming theory of the prosecution can produce trial error of constitutional proportions." _United States v. Chandler_, 388 F.3 796, 788 (11th Cir. 2004).

[27]   See n. 16, _supra._

"Access" cannot possibly satisfy the required "official acts" definition, including the "decision or action" component thereof, or satisfy the requirement that Mr. Nelson be bribed "in connection with" his "official duties" (the Indictment term) regarding the official business or transactions of the JPA. Respectfully, no further analysis of this Petition need be undertaken, given the fact that the government's "access" theory cannot possibly pass constitutional muster, under *McDonnell*.[28]

 (4) Jury Instructions – Constitutional and *McDonnell* Defects

 60. In Part B above, we discussed the jury instructions requirements set forth in *McDonnell*. Respectfully, the jury instructions in this case contained the same constitutional defects as those identified in *McDonnell*. See paragraphs 35-42, *supra*. Indeed, and again, respectfully, the defects in the Nelson jury instructions are all the more pronounced (at the urging of the government).

 61. In defining the basic mail fraud honest services crime, the Court instructed the Nelson jury that it involved a "bribe," but then defined that "bribe," based on the nebulous requirement that Mr. Nelson "be corruptly influenced or rewarded for a transaction or series of transactions of the Jacksonville Port Authority." Jury Instruction 14 (emphasis added) (Doc. 333). Similarly, Jury Instruction 16, in defining the "bribery statute," defined bribery as where one "intends to be influenced or rewarded in connection with certain transactions of the government or agency. *Id.* (emphasis added).

 62. This government definition would (and did) allow a conviction for merely meeting, taking phone calls, or engaging in personal conversations, all of which, in light of *McDonnell*, is constitutionally impermissible. Respectfully, by not requiring proof of and defining Nelson's

---

[28] This is all the more true, given that Mr. Nelson's request for a jury instruction confirming that "providing access ... is not a crime" (Doc. 240 at 13) was rejected.

"official duties," the jury instructions impermissibly broadened the Indictment, thus allowing an improper amendment of the Indictment. Such amendments create reversible error. *Stirone v. United States*, 361 U.S. 212, 217 (1960).

63.     Thus, in neither instruction was the jury required to find an "official act."[29]  Instead, just like Governor McDonnell, the jury was free to convict Mr. Nelson of virtually <u>any</u> involvement or "transaction or series of transactions" involving the JPA – whether or not it was an "official act," or whether or not Mr. Nelson "made a decision or took an action" on that matter.  The jury in *McDonnell* was permitted to convict McDonnell if he was engaged "in a series of steps to exercise influence or achieve an end."  *McDonnell* at 11.  Similarly, the jury in Nelson was permitted to convict if Nelson did nothing more than engage in "a transaction or series of transactions."  The "series of transactions" definition in Nelson is no different than the defective "series of steps" definition in *McDonnell*, and thus the basis for Mr. Nelson's conviction is prohibited by the *McDonnell* decision.[30]

64.     Nelson recognizes the Court sought to fashion an instruction embracing the government's theory of bribery, which used §666, to define the "bribery" conduct.  However, as noted above, under the due process requirements of *Skilling* and *McDonnell*, any honest services

---

[29]  Mr. Nelson's request for a jury instruction (Doc. 240 at 12, 16, 22) requiring proof that he performed "official duties," and an "official act" – the express Indictment term and the element constitutionally mandated by *McDonnell* – was rejected – notwithstanding the Indictment's repeated assertion Mr. Nelson demanded bribes "in return for being influenced in the performance of his <u>official duties</u>."  See note 12, *supra*.

[30]  Clearly, the failure to properly instruct the jury as to the elements of bribery constitutes reversible error, since *per force*, it <u>did</u> "contribute to the verdict obtained" – just like it did in *McDonnell* (and, in Nelson, with greater force). *McDonnell at 30; Neder v. United States*, 527 U.S. 1, 16, 19 (1999).

"bribery" predicate must involve real bribe conduct – which means the public official must be taking some "official act" to earn his bribe. Section 666 itself requires no less – especially where the Nelson Indictment repeatedly asserted the bribe was for his "official duties."

65.      Indeed, this Honorable Court previously held that a §666 bribery scheme was only "complete if the government could demonstrate an exchange of a benefit to the official 'for his promise to perform an official act." Doc. 120 at 5. Thus, six years ago, this Honorable Court correctly held that a §666 prosecution required the same "official act" element McDonnell has confirmed to be a due process element of an honest services bribery prosecution.

66.      Section 666 criminalizes the actions of one who "corruptly solicits … anything of value … intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization." 18 U.S.C. §666(a)(1)(B)(emphasis added). Clearly, this "business" or "transaction" must (as specifically defined by the statute) involve some "official action" of the organization – and not some irrelevant non-official action, personal relationship, or private action of the defendant. That obvious statutory (and common sense) requirement is further confirmed by the definition of "agent" as "a person authorized to act on behalf of … an organization." 18 U.S.C. §666(a)(1) (emphasis added). One is clearly "authorized to act on behalf of … an organization" – by that organization – with regard to the official acts of that organization – not some personal acts, or acts irrelevant to the official business of that organization. Any other meaning of that definition, and the requirement the corrupt acts of the defendant be "in connection with any business, transaction, or series of transactions of such organization," would be nonsensical, and certainly would not constitute a crime.

67.      Given the express language of the Indictment, requiring that Mr. Nelson receive the

24

"bribes" – "in return for being influenced in the performance of his **official duties**," it is unnecessary to further explore the nuances of a §666 bribe, from those of a §201 bribe – especially since the Indictment alleged an "honest services" mail fraud. However, it is instructive to note the symmetry between §666 and §201.

68.    After the passage of the federal bribery statute (18 U.S.C. §201), Congress, perceiving the existence of a potential unprotected type of federal expenditure (which used public money, but involved funds not administered by federal officials), and desiring to ensure that the same public protection that prohibited public corruption by federal officials was extended to such programs, and to subject them to the same proscriptions against bribery and corruption, proposed new legislation to accomplish that end, and enacted 18 U.S.C. §666. In doing so, Congress noted as follows:

> With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the federal government may be considered as a "public official" under the definition in 18 U.S.C. 201(a) as anyone "acting for or on behalf of the United States, or any Department, Agency or branch of government thereof, including the District of Columbia, in any official function." The courts of appeals have divided on the question whether a person employed by a private organization receiving federal monies pursuant to a program is a "public official" for purposes of section 201.

S. Rep. 98-225, 369-70, 1984 U.S.C.C.A.N. 3182, 3510.

69.    Acting on that concern, the provisions of the bill, as reported are:

> Part C adds a new Section 666 to Title 18, United States Code. Subsection (a) makes it a federal crime for an officer, employee or agent of an organization or of a state or local government agency that receives benefits in excess of $10,000 per calendar year pursuant to a federal program to steal, embezzle, obtain by fraud, willfully misapply or otherwise knowingly convert without authority property valued at $5,000 or more. The offense is punishable by up to ten

years in prison and a fine of up to $100,000 or twice the value of the property obtained in violation of this section, whichever is greater, a defined in subsection (d) and require no further explication. The committee intends that the term "federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of federal assistance," be construed broadly, consistent with the purpose of this section to protect the integrity of the vast sums of money distributed through federal programs from theft, fraud, and undue influence by <u>bribery</u>. However, the concept is not unlimited. The term "federal program," means that there must exist a specific statutory scheme authorizing the federal assistance in order to promote or achieve certain policy objectives. Thus, not every federal contract or disbursement of funds would be covered. For example, if a government agency lawfully purchases more than $10,000 in equipment from a supplier, it is not the intent of this section to make a theft of $5,000 or more from the supplier a federal crime. It is, however, the intent to reach thefts and <u>bribery</u> in situations of the types involved in the *Del Toro*, *Hinton*, and *Mosley* cases [involving acts by state and local officials] cited herein."

S. Rep. 98-225, 369-70, 1984 U.S.C.C.A.N. 3182, 3510-11 (emphasis added).

70. Of course, Congress's use of the term "bribery" must be given its common and ordinary meaning,[31] and must be construed in the light most favorable to Mr. Nelson.[32] Just as this Court concluded, a "bribe," in the context of depriving the public of their right to honest services (as alleged here – Indictment at 4, ¶B.1), means the public official is receiving the "bribes" – "in return for being influenced in the performance of his **official duties**."

71. It is significant that, although the Committee stated it intended the individuals subject

---

[31] "As in all cases involving statutory construction, our starting point must be the language employed by Congress, and we assume that the legislative purpose is expressed by the ordinary meaning of the words used. Thus, absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *United States v. Fisher*, 289 F.3d 1329, 1338 (11th Cir. 2002), *citing American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

[32] This is a proper application of the rule of lenity. "The rule of lenity is a canon of statutory construction that requires courts to construe ambiguous criminal statutes narrowly in favor of the accused." *United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010).

to the law be "be construed broadly," it did not use the language in describing the <u>conduct</u> at issue, which remained the same as that proscribed in the 18 U.S.C. §201. As originally enacted, §666 required that "anything of value" be given or received "for or because of" some act on the part of the official recipient of the federal funds. 18 U.S.C. §666 (1984). Clearly, this prepositional phrase contemplated a *quid pro quo*. As envisioned, the *"quo"* is the official act for which the *"quid"* is given.

72.    Section 42 of the 1986 Omnibus Crime Act was enacted to <u>clarify</u> and <u>narrow</u> the scope of §666, as made clear by the Congressional intent:

> Section 42 of the bill amends 18 U.S.C. 666, which deals with theft or bribery concerning programs receiving federal funds. Section 42 <u>clarifies</u> that 18 U.S.C. 666 covers programs of Indian Tribal governments and Tribal government agencies. In addition, section 42 amends 18 U.S.C. 666 to <u>avoid</u> its possible application to acceptable commercial and business practices. Section 42 also makes <u>technical amendments</u> in 18 U.S.C. 666 to conform that section to the drafting style and format used generally in title 18 of the United States Code.

H.R. REP. 99-797, 30, 1986 U.S.C.C.A.N. 6138, 30 (emphasis added).

73.    Thus, it is clear that, in amending §666, Congress did not, in any way, intend to <u>broaden</u> its scope. The focus and aim remained the same, that is, to extend the coverage of 18 U.S.C. §201's bribery prohibitions to a greater <u>class of individuals</u>, prohibiting bribes for official acts relating to programs using government funds – not to <u>expand the definition of bribery</u>. Thus, although the original language of §666, requiring that "anything of value" be given or received "for or because of" some act on the part of the recipient of the federal funds, was amended to state that the thing of value (the bribe) must be given "in connection with" the official act on the part of the recipient, this amendment was not intended to loosen or broaden the clear *quid pro quo* – a bribe in

exchange for a corrupt act – requirement that *McDonnell* confirms is necessary for an 18 U.S.C. §201 conviction.[33]

74.     Of course, as noted above (¶48), in the Nelson Indictment, as this Court has confirmed (Doc. 120 at 6-7), the Government <u>did</u> allege a *quid pro quo* (see ¶48, *supra*) , regarding their honest services bribery theory, and thus was obliged to prove it – apart and aside from whether §666 requires it.

75.     In addition, the clear Congressional intent is best demonstrated by the fact that the amended "provision parallels the bank bribery provision (18 U.S.C. 215)" – which, of course, requires a *quid pro quo*.[34] See Pub. L. No. 99-370, 99 Stat. _____ (1986). See also H.R. REP. NO. 335, 99th Cong., 1st Sess. (1985); 131 CONG. REC. H-9275 (daily ed. Oct. 29, 1985) (remarks of Rep. Conyers.) H.R. REP. 99-797, 34, 1986 U.S.C.C.A.N. 6138, n.9.

76.     Just as the 1986 amendment to §666 was done for the purpose of preventing the criminalization of otherwise innocent commercial conduct, the bank bribery statute, 18 U.S.C. §215, was similarly amended.  As amended, the language of §215, like that of §666, was narrowed to include a requirement that a person act "corruptly."  In interpreting §215, courts have held it to require a *quid pro quo* – an official act in exchange for a corrupt payment – intent. *See, e.g., United*

---

[33] This Congressional analysis clearly distinguishes the instant analysis from that performed by the *McNair* court, which simply considered the statutory text – without examining the legislative history – and, finding no statutory use of the <u>exact</u> words "*quid pro quo*," determined that none was required. *United States v. McNair*, 605 F.3d 1152, 1187-88 (11th Cir. 2010). This analysis was, respectfully, short-sighted, and overlooked the legislative history, as well as the significance of the "in connection with" language in the current version of §666. The word "connection," both by definition, and in common parlance, implies some link between the "thing of value" and the official act. It is "something that connects," "the state of being connected," and a "causal or logical relation or sequence." *See* Websters Seventh New Collegiate Dictionary at 176 (1963).

[34] 11th Circuit Pattern Jury Instructions (Criminal), Offense Instructions O6.1 and O6.2.

*States v. Arnone*, 973 F. Supp. 206, 209 (D. Mass 1997), stating the "in connection with" language "ma[kes] it clear the jury ha[s] to find some exchange, some benefit, some quid pro quo for conviction."[35]

77.     Analyzing the *quid pro quo* requirement, it is clear this must be an official act done corruptly, in exchange for a bribe. The legislative history, as amplified by the holding in *McDonnell*, as well as the fact this Court held the Indictment <u>did</u> allege a *quid pro quo* (see ¶48, *supra*), makes it clear that the failure to <u>prove</u> a *quid pro quo* is fatal to Mr. Nelson's conviction.[36]

78.     However, as noted above, it is not necessary for this Court to (again) conclude the Nelson Indictment truly required a *quid pro quo*. That is because it cannot be gainsaid the Nelson Indictment required the same "official acts" proof required in *McDonnell*. As noted in note 12, *supra*, and addressed in detail in Part C.(2), the Indictment specifically asserted the "Manner and Means" by which the honest services fraud was perpetrated was that Nelson would demand the "bribe" "in return for being influenced in the performance of his **official duties**." Indictment at 5, ¶C.2. Repeatedly, the Indictment asserted the payments to Nelson were demanded by Nelson "in return for being influenced in the performance of his **official duties**." Indictment at 7 and 14, ¶D.1 and 2, and ¶D.35. As noted above (see, e.g., ¶12), the Indictment itself mandates application of *McDonnell*, since the government accused Mr. Nelson of taking bribes in the performance of his "official duties." Thus, it was incumbent on the government to prove that which they alleged, that is, that Mr. Nelson actually took "official action" – not simply that he allowed Young to have

---

[35]    As noted, the 11th Circuit likewise requires a *quid pro quo* for §215. See n. 34.

[36]    The Supreme Court, in analyzing the due process requirements of the honest services bribery mail fraud statute, would surely not conclude a §666 bribery predicate would require less protection for public officials than that expressed in their opinion.

"access" to him.

79.     It remains clear, as a matter of law, and as mandated by the Nelson Indictment, that, regardless of what "bribery" statute the government selected to frame their honest services fraud, due process requires that the public official engage in some official act, such that the Nelson "access" theory is constitutionally deficient.

80.     This requirement is all the more applicable to Nelson, given the pretrial findings of this Court, concluding the Indictment did contain a *quid pro quo* allegation, and that a §666 bribery scheme was only "complete if the government could demonstrate an exchange of a benefit to the official 'for his promise to perform official acts." Doc. 120 at 5.[37]

81.     That "official act" (this Court's term), the "official duties" (the Indictment's term) and "official action" (the term written by Justice Sotomayor) requirement is, of course, synonymous with the requirement in *McDonnell* of "official acts" – the very element about which the jury in Nelson was never informed.

82.     In short, Nelson is entitled to plenary application of *McDonnell*, and its "official acts" due process requirement, since (1) the Indictment alleged he took bribes in exchange for performing his "official duties," (2) this Honorable Court held the Indictment so alleged, and also concluded that allegation constituted a *quid pro quo* allegation, and (3) this Honorable Court concluded a §666 prosecution required that Nelson perform "official acts" – precisely the term applied in *McDonnell*.

83.     Moreover, in addition to the failure to correctly instruct the jury as to the requisite due process elements of "bribery," multiple jury instructions requested by Mr. Nelson, in an effort to cure

---

[37] See a detailed analysis of the *quid pro quo* element, and the requirement, under §666, that the defendant perform "official actions," in Part C.(6), ¶¶97 - 105, *infra*.

this ambiguous "access" bribery standard the government applied to Mr. Nelson, were rejected.[38]
See Nelson's Supplemental Proposed Jury Instructions. Doc. 240. Among the instructions requested
by Mr. Nelson (but rejected, at the urging of the government), that were designed to ensure he was
not subjected to a defective constitutional theory, included the following:

   a. Specifying that an honest services "bribe" must be "in connection with the
official duties of that public official." Nelson Proposed Instruction Nos. 4 and 5 (Doc. 240 at 12 and
16). Thus, not only was the jury not informed they were required to find Nelson took "official
action," they were not informed of the corollary, that is, any such action must have been connected
to his official duties – as expressly charged in his Indictment – as to both the honest services fraud
counts (Count 1-13 – "demand ... bribe money ... in return for being influenced in the performance
of his official duties") and the §666 counts (Counts 25-36 – "thing of value ... intending to be
influenced ... in connection with ... Jaxport"). See ¶66, *supra* and ¶¶97-105, *infra*.

   b. Properly (and accurately) defining the "official duties" of Mr. Nelson (as an
appointed, voluntary, part-time, uncompensated member of the JPA Board) – based both his
statutory requirements and the facts at trial – as having to meet once a month, to vote with other
Board Members to select the Port Executive Director, approve the budget, and vote on any contract
coming before the Board. Nelson Proposed Instruction No. 4 (Doc. 240 at 12-13). This instruction
was particularly significant, since, as repeatedly stated, Mr. Nelson was entirely within his legal
rights to lobby his own agency (if he had done so – which was disputed), unless he voted on a matter

---

[38] Failure to give a requested instruction is normally reviewed for an abuse of discretion.
*United States v. Dohan*, 508 F3d 989, 993 (11th Cir. 2007). Respectfully, given the *McDonnell*
decision, those multiple failures, individually and in totality, constituted an abuse of discretion.
Specifically, as confirmed by *McDonnell*, it was constitutional error to not give the correct
instructions.

for which he was lobbying (which he did not do). However, as noted above, the government persuaded the Court to charge the jury that the "duty of a public official or employee to provide honest services to the public is established by <u>federal</u> law" (Jury Instruction No. 14 at 14 – Doc. 333 – emphasis added), thus violating the very "federalism concerns" expressed by *McDonnell*, at 24, and depriving Mr. Nelson of his Florida statutory immunity from this unfounded prosecution.

        c.      Informing the jury that, as "a private citizen and businessman ... by Florida law, [Mr. Nelson] should not be denied the opportunity, available to all other citizens, to acquire and retain private economic interests." Doc. 240 at 13. This instruction quoted, *verbatim*, the applicable Florida statute. However, the government persuaded the Court to ignore the very state law that <u>defined</u> Mr. Nelson's official duties and responsibilities, thus further transgressing the federalism holdings of *McDonnell* (at 24).

        d.      Informing the jury the government's "access" theory was not a lawful basis for a bribery conviction (as demonstrated by *McDonnell*), by informing the jury: "I also instruct you that Mr. Nelson providing access to Mr. Young, or Mr. Young's company, or the Wren Group, is not a crime." Doc. 240 at 13.

        e.      Nor was the jury instructed that, "As a volunteer non-paid, part-time citizen, donating his time to serve on the Board ... Mr. Nelson ... would be in violation of his contractual [consulting] agreement to not provide access to himself for such consulting. Thus, you may not find Mr. Nelson guilty based on him providing <u>access</u> to himself to provide consulting." Doc. 240 at 13-14 (emphasis added).

        f.      Mr. Nelson sought the same instructions as to the §666 counts, such that the jury would have to find that Mr. Nelson did "perform a <u>specific act</u> as a reward for [the monthly

consulting payments]," and that it was "not unlawful for Mr. Nelson, as a Board Member ... to receive payments from a company, or lobbyist for a company, doing business with the Port ... – unless you find the payments were understood by Mr. Nelson ... as a <u>bribe</u>, <u>in exchange for which</u> he acted corruptly in the execution of his <u>official duties</u>."  Nelson's Supplemental Proposed Instruction No. 8 – Doc. 240 at 19-20 (emphasis added).  Similarly, Nelson requested the jury be instructed (entirely consistent with the Florida Statute, the Voting Conflict Form and the advice he received from General Counsel) it was "not illegal for Tony Nelson to be a paid consultant ... and, at the same time, communicate concerns of Lance Young and/or SSI and/or The Wren Group to officials at the Port." *Id.* at 20.

       g.    Mr. Nelson's Supplemental Proposed Instruction No. 9 requested the jury be instructed that, to convict, they must find "an explicit *quid pro quo*, that is an explicit promise or undertaking to perform or not perform an <u>official act</u> in exchange for a thing of value." Doc. 240 at 22 (emphasis added).  Since *McDonnell* confirms bribery requires a *quid pro quo*, the omission of that element was fatal.  See ¶¶ 97-105 below.

    84.    In short, just as Governor McDonnell's jury instructions were constitutionally defective, *a fortiori*, those of Mr. Nelson were all the more so.

    (5)    <u>"Access" – 6 Claims – No "Decision" or "Action"</u>

    85.    As noted, the government's theory of "bribery" rested solely on the testimony of Young that Mr. Nelson supposedly afforded "access" to Nelson for Young.  Of course, Mr. Nelson had a written consulting agreement, <u>requiring</u> such "access," and he received actual checks for his services (not cash in a brown paper bag), and reported that income on his tax returns.  Thus, application of *McDonnell* to Mr. Nelson, and rejection of the "access" theory of prosecution, is all

the more required, since the government theory of proof was applied to a volunteer, non-paid, part-time Board Member who, under express and directly applicable state law, was fully entitled to attempt to earn a living as a consultant.

86.     In reviewing the evidence of "bribery," this Honorable Court stated that Young "was the only person in this courtroom to say this is a bribe." Doc. 427 at 27:13-14.  In light of *McDonnell*, that finding is all the more important, since Young's <u>definition</u> of "bribery" was the definition set forth in his own plea agreement (and hence crafted by the government and therefore adopted by the government as the <u>government's</u> theory of bribery), which identified the "bribery" *quid pro quo* by asserting that "Nelson provided special '<u>access</u>' and assistance to YOUNG at Jaxport." Lance Young Plea Agreement, Doc. 15, Case 3:10-cr-00030-TJC-MCR at 24 (emphasis added).  As found by this Court, the only proof of "bribery" came from Young. Since Young's claim of bribery was founded on the constitutionally defective "access" theory, Mr. Nelson's convictions must be vacated.

87.     This "access" term, selected and relied upon by the government, as their theory of "bribery," became a slippery slope during trial, not only breaching the constitutional limits of *Skilling*, but now *McDonnell*.  In addition to the fact this "access" evidence failed to identify any concrete activity of Mr. Nelson at the Port, or identify any activity that was not lawful, paragraphs 89-96, *infra*, will analyze the six areas of Mr. Nelson's supposed "access" for SSI, as measured by the constitutional yardstick of *McDonnell*.

88.     However, prior to examining these areas, the Court is again referred to the Voting Conflict form (Nelson Ex. 4A), which is expressly derived from Florida Statutes, setting forth the obligations of public officials – which obligations clearly frame the "honest services" required of

34

those officials. As an <u>appointed</u> official, Mr. Nelson had plenary authority to "participate in these matters" (i.e., matters that might inure to the "gain or loss of a principal by whom he or she is retained"), and could even "influence the decision prior to the meeting at which the <u>vote</u> will be taken" – as long as he did "abstain from voting." *Id.* Thus, even <u>if</u> there was a matter presented by the government involving a Board <u>vote</u> – which there was not – Mr. Nelson could lawfully have sought to <u>influence</u> the decision, for SSI, <u>without</u> violating the duties of his office – as long as he did not vote (and he did not). *A fortiori*, Mr. Nelson could present legitimate issues relevant to SSI to Port staff, in the <u>absence</u> of any Board vote, and could not be lawfully accused of exerting corrupt influence. By law, he was <u>entitled</u> to have such communications.[39] For that reason, respectfully, separate and apart from the defective nature of the six "access" areas, Mr. Nelson is entitled to vacation of his convictions.

89.     <u>#1 – Help with 1st Contract</u>. This involved a claim by Young that Mr. Nelson bragged about helping him get his first contract – a claim made at the time of the supposed "payroll" comment. As the Court observed, SSI's obtaining of their December 7, 2005 dredging contract (C-1191) was <u>not</u> part of this case, and thus could not, as a matter of law and fact, constitute any "quo" to support a "bribe" – especially since the alleged conspiracy did not commence until August 2006 – some <u>9 months later</u>. However, the Court declined to strike this testimony, or the Naranjo testimony presented by the government.[40]   Nevertheless, even if this testimony had a proper

[39] See the evidence recited n. 4, *supra*, documenting the record evidence of that uncontested state law.

[40] Agreeing this Naranjo meeting "predated the time frame of the conspiracy," the Court concluded it was admissible "to blunt Mr. Nelson's contention ... he had little role in shaping policy" and "provided evidence that Mr. Nelson was recommending SSI for Port business." Doc. 364 at 7. Admissible or not, clearly, a meeting <u>outside</u> the Indictment dates cannot qualify as a "bribe" event constituting an "official action" <u>within</u> the charged case, and thus cannot provide proof of the crime

evidentiary basis, it remains undisputed this "proof" is irrelevant to any bribery "quo" charged by the Indictment (or "*quid*" either – since no payment related to the first contract was paid by Young to Nelson), and thus cannot be relied upon to defeat Mr. Nelson's entitlement to the granting of this Petition. Even if this "access" incident had been within the alleged conspiracy, Mr. Nelson made no official "decision," and took no official "action" on this matter.[41]

90.    #2 – FIND [spoil] site.  This matter involved a claim by Young that Mr. Nelson rendered some underidentified assistance to him in the Spring of 2006 – again prior to the alleged "bribe" conspiracy, which commenced supposedly around the time of the August 2006 consulting agreement between Wren and Ja-Ash. Thus, it remains undisputed that this "proof" is irrelevant to any bribery "quo" charged in the Indictment. Again, this second "access" claim is wholly absent of any proof of either of the two *McDonnell* requirements for bribery. Even if this "access" incident had been within the alleged conspiracy, there was no proof of any "question or matter," or that Mr. Nelson made any official "decision," or took any official "action" on this matter.

91.    #3 – Pumps.  The government asserted, but only through Young, that Mr. Nelson

---

alleged. It was incumbent on the government to prove a bribe involving "official action" occurring within the charged case. Moreover, *McDonnell* now rejects any prosecution based on the politician addressing "policy" issues, or making mere recommendations. *McDonnell* at 26. Thus, respectfully, the Court's two bases for admissibility (of evidence clearly outside the Indictment charges) relied on grounds rejected by *McDonnell* as a lawful basis for a bribery prosecution. That is all the more so since *McDonnell* rejects, as a basis for "bribery," any recommendations in which the public official made no decision – such as here.

[41] Moreover, the record is clear Mr. Nelson had his conversation with Naranjo for salutary purposes – based on a well-founded and documented belief the existing dredging company had submitted fraudulent bills to the Port. Thus, this overreaching prosecution evidence struck at the very heart of the Supreme Court's concern that this "breathtaking expansion of public corruption law" would improperly impact "conscientious public officials," and "damage their ability effectively to perform their duties" – such as Mr. Nelson seeking to prevent a fraud on his agency. *McDonnell* at 22-23.

helped him get an invoice for rental pumps paid. That testimony was both unspecific (in that it failed to assert how Mr. Nelson helped) and uncorroborated. Moreover, the approval for payment was the act of Ron Baker, the #2 man at the Port. Gov. Ex. 83c. There was not one scintilla of evidence that Mr. Nelson was involved, in any way, with the approval of that invoice. Thus, there was no proof of any "question or matter," or that Mr. Nelson made any official "decision," or took any official "action" on this matter. Aside from the absence of proof of any involvement by Mr. Nelson in the approval of that invoice, the fact remains that this incident also represents a perfectly legitimate and honest request for payment, and there was no evidence of any corrupt request by Mr. Nelson for assistance in that payment. Thus, if Mr. Nelson is to stand convicted of bribery, when a lawful invoice was paid by the Port, in the absence of any evidence of an unlawful method being used to accomplish the payment (as required by *McDonnell* and Jury Instruction 16 – Doc. 333), then all manner of public officials who supposedly offer some legitimate form of assistance to vendors at their agency will become victims of this aggressive and constitutionally defective government "access" theory of bribery. *McDonnell* does not permit a conviction when "conscientious public officials arrange meetings for constituents" – especially when the purpose is lawful and the request is entirely proper. *McDonnell* at 22. Lastly, no proof whatsoever was presented that Mr. Nelson made any official "decision," or took any official "action" on this matter.

92.     #4 – Call from Mr. Nelson's office to staff. In his most obtuse and defective of all "access" claims, Young testified he was in Mr. Nelson's office and observed Mr. Nelson make a call to "someone" on the JPA staff. Of course, as with Young's other testimony, there were no records. Worse yet, he could not recall the time or date of the call,[42] had no idea who was called, and had no

---

[42] Counsel objected, but the government asked a leading question: Was this during the time you were making the monthly payments? Not surprisingly, Young answered in the affirmative, as

idea the purpose of the call.  This undefined "access" claim cannot possibly support a "bribery" verdict, or establish the existence of some corrupt influence on a staff member.  In any event, it too had to involve a lawful request – as Young agreed that all of his requests were so.  Again, we are left with a lawful (but entirely unidentified) request and no evidence it was pursued by some unlawful method.  *McDonnell* instructs that mere phone calls cannot meet the elements of bribery.  That is all the more true here, given the complete absence of any proof as to whether this call involved a "question or matter," or whether Mr. Nelson made any official "decision," or took any official "action" at all – since the record fails to even reveal what the matter was.

93.    #5 – Fuel price increase.  The government produced evidence of a lunch meeting, attended by Executive Director Ferrin, Deputy Director Baker, Tim Murphy (Engineering), Mr. Nelson and Young, in which Young requested consideration of an increase in his dredging contract, due to a fuel price increase.  According to Mr. Ferrin, Mr. Nelson just sat there and listened, and never sought to try to influence Mr. Ferrin's decision at all.[43]  The government, under their "access" theory, urged that meeting was proof of a bribe.  How?  First, Young arranged the meeting himself, as he was able to do, having direct access to both Ferrin and Baker.  Second, Mr. Nelson did nothing! He simply requested of Ferrin permission to attend, and then sat there and listened, and ate a meal. Thus, again, we have a lawful request by Young, and the complete absence of any effort to influence the decision.  Moreover, using the government's own yardstick of proof required to establish a bribe,

he knew he must.

[43] This is precisely the testimony (found to be insufficient) relevant to one of the "bribe" incidents of which Governor McDonnell was accused, where the "aide later testified that she did not feel pressured" by the Governor to do "anything other than to have a meeting."  *McDonnell* at 5. Here, Mr. Nelson did not even request the meeting.

we know with certainty Mr. Nelson's appearance at a meeting with the Executive Director can <u>not</u> establish <u>any</u> form of bribery by a vendor, because a far more probative meeting with Ferrin, arranged by Fiorentino (the immediate past Chairman of the JPA), was deemed by the government to not be criminal.[44] However, when Mr. Nelson listens quietly, at a public lunch meeting, and lets the <u>staff</u> make whatever decision they deem appropriate, and does nothing to interfere – the government says that is a <u>crime</u>. That is not only unfair, but violates due process, and clearly establishes that this fuel cost meeting cannot satisfy the *McDonnell* elements of bribery. Again, there was no proof that Mr. Nelson made any official "decision," or took any official "action" on this matter. Indeed, the proof is precisely the opposite.

94.     <u>#6 – Yates retainage</u>. This was understood by all to <u>not</u> be a Port issue at all, as it involved a contract between General Contractor Yates and subcontractor SSI – two private companies.[45] As the Court heard from Aaron Kendrick (the Port Treasurer), this inquiry was decided by four high ranking members of the Port, including the CFO and Treasurer. Mr. Kendrick explained the careful deliberative process by the Port in determining that releasing the retainage, so

---

[44] The government assured Fiorentino he committed no crime.  Fiorentino could have (1) a <u>private</u> meeting with Young and Ferrin, whereas Mr. Nelson simply attended a <u>public</u> luncheon (attended by multiple witnesses), (2) at a time when SSI was seeking a multi-million dollar dredging contract, whereas SSI was already a trusted dredger (with a contract) at the time of the fuel meeting, and, (3) after the Fiorentino meeting, SSI got a $2.7M dredging contract, whereas, after the meeting Nelson attended, SSI was told <u>no</u> to its request for a fuel increase.  Clearly, this fuel meeting could not establish "bribery" conduct by Mr. Nelson – as measured by the government's own yardstick.

[45] SA Hill, in reporting that Mr. Nelson told her he contacted David Smolder at the Port to ask him to look into this matter, admitted that Mr. Nelson told her this was "<u>not</u> a JPA issue." Thus, Mr. Nelson could not have been attempting to discharge his "official" duties, since this matter was between two private companies.  Moreover, Mr. Nelson told her that Smolder reported he was "already looking into it and agreed that is what should be done" – that is, the SSI request for payment was fair, and there was nothing Nelson needed to do to assist.  Hill August 18, 2008 FBI 302 interview of Mr. Nelson at 3.

Yates could pay SSI, was entirely fair. Indeed, keeping the retainage would have been <u>un</u>fair. The SSI dredging was completely done, and it would not have been fair to hold SSI's 5% retainage another year. More to the point, Mr. Nelson did not try to influence Mr. Kendrick at all. Again, all of the correspondence on this matter involved <u>direct</u> dealings between the Port (including with Deputy Executive Director Baker) and SSI, and Young and his staff,[46] without <u>any</u> contact with Mr. Nelson. Once again, we are left with a <u>lawful</u> request and no evidence it was pursued at all – let alone by some <u>unlawful method</u>. Again, there was no proof of any "question or matter," or that Mr. Nelson made any official "decision," or took any official "action" on this matter. Nor could he, since this was not even a Port issue.

95.     In short, <u>none</u> of the "access" incidents can possibly qualify as acts of bribery, especially in light of *McDonnell*.

96.     Nor can the "stream of benefits" theory support this conviction. That is precisely one of the fatal errors found in *McDonnell* – in that the jury was permitted to convict "on the theory that [he] accepted things of value that were given for future unspecified action." *McDonnell* at 12. Instead, the "'question, matter, cause, suit, proceeding or controversy' must be more focused and concrete." *Id* at 17. Moreover, neither the Nelson Indictment nor the jury instructions asserted some <u>future</u> action, <u>and</u> they both clearly asserted a *quid pro quo* nexus between the bribe and the official action of Nelson at Jaxport. Nelson was charged with receiving the "thing of value" [bribe] "<u>in connection</u> with a transaction or series of transactions." Indictment at 21. The §666 jury instruction informed the jury the same nexus was required, explaining the bribe had to be "<u>in connection</u> with certain transactions of the government or agency." Inst. No. 16 (Doc. 333 at 26). Clearly, that "in

---

[46]  See Nelson Exs. 28B, C, D, E, I, L and N.

connection" element is no different than the "in exchange for" *quid pro quo* element.

(6)   *Quid Pro Quo*

97.   The Omnibus Order (Doc. 120), at p. 5, held that the *Skilling* case, and/or 11th Circuit precedent, did not require a *quid pro quo*. Instead, a bribery prosecution was sufficient if there was a "promise to perform official acts or to perform such acts as they arose." Based on the express language of the Indictment, and Supreme Court law (especially *Skilling*), counsel respectfully disagreed, and sought jury instructions requiring such proof. Doc. 240 at 17 and 20.

98.   Indeed, as noted above, this Honorable Court held, pretrial, the Indictment <u>did</u> assert the existence of a *quid pro quo*, in that it actually alleged "the 'quid' of monies paid in return for the 'quo.'" Doc. 120 at 6-7. In support of that conclusion, the Court cited the exact same language and paragraphs from the Indictment cited by Mr. Nelson in note 12, *supra*, that is, the Indictment specifically asserted the "Manner and Means" by which the honest services fraud was perpetrated was that Nelson would demand the "bribe" "in return for being influenced in the performance of his **official duties**." Indictment at 5, ¶C.2. Repeatedly, the Indictment asserted the payments to Nelson were demanded by Nelson "in return for being influenced in the performance of his **official duties**." Indictment at 5, 7 and 14, ¶C.2, ¶D.1 and 2, and ¶D.35. Doc. 120 at 6-7. Notwithstanding that finding, and the express language of the Indictment, the government declined to agree to inform the jury of this *quid pro quo* requirement.

99.   In support of the eventual denial of such an instructions, this Court held that, "without express direction from the Supreme Court, even if any of these decisions [*Ganim*,[47] *Whitfield*,[48] and

[47]   *United States v. Ganim*, 510 F.3d 134 (2nd Cir. 2007).

[48]   *United States. Whitfield*, 590 F.3d 325 (5th Cir. 2009).

*Kemp*[49] – cited by Mr. Nelson in his JOA motion] required a quid pro quo, this Court would be unlikely to follow their guidance" – in light of *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010), which held that a *quid pro quo* was not a required element of a §666 charge.  Doc. 120 at 5-6.[50]  However, this Honorable Court now has that further express direction from the Supreme Court, requiring a *quid pro quo* for an honest services bribery conviction.

100.     Moreover, separate and apart from the correctness, *vel non*, of *McNair's* pre-*Skilling* and pre-*McDonnell* holding that §666 does not require proof of a *quid pro quo*, as noted above (see, e.g., Part C.(2), ¶¶47-57) the Nelson indictment did allege, repeatedly, as its theory of proof, that the payments to Nelson were demanded by Nelson "in return for being influenced in the performance of his **official duties**."  Indictment at 5, 7 and 14, ¶C.2, ¶D.1 and 2, and ¶D.35.  Doc. 120 at 6-7. Thus, independent of whether a *quid pro quo* was required, *McNair's* §666 holding does not vitiate the reality that the Nelson Indictment charged the same "**official duties**" verbiage addressed in *McDonnell*, and thus the *McDonnell* holding applies with equal strength to Nelson, including as to his §666 counts.[51]

101.     In addition to the express language of the Manner and Means, asserting the bedrock

---

[49]  *United States v. Kemp*, 500 F.3d 257 (3d Cir. 2007).

[50]  As was noted by this Court at the time of its order, *McNair* was decided prior to the decision in *Skilling*.  Doc. 120 at 6.  Thus, respectfully, *McNair* was rendered without the benefit of the Supreme Court guidance in *Skilling*, and, of course, without the guidance now of *McDonnell*. Morever, given the fact the Indictment expressly alleged a *quid pro quo*, as found by this Court, regardless of the *McNair* opinion, the government was obliged to prove that which it alleged. However, they were not required to do so.  For that reason alone, the convictions should be set aside.

[51]  Indeed, although concluding, "the government is not required to tie or directly link a benefit or payment to a specific official act by that County employee" (*McNair* at 1188 – emphasis added), *McNair* thus recognized that even §666 requires an "official act" – just like this Court ruled, and just like the Nelson Indictment alleged.

government prosecution *quid pro quo* theory that Mr. Nelson took "<u>bribe</u> money ... <u>in return for</u> being influenced in the performance of his <u>official duties</u>" (Doc. 1 at 5, ¶¶1 and 2), as noted above (¶¶66 and 83.a), the substantive §666 counts (25-36) charged identical *quid pro quo* language, asserting that Mr. Nelson demanded a "thing of value ... intending to be influenced ... <u>in connection with</u> ... Jaxport." The prepositional phrase, "in connection with" is synonymous with the "in return for" language alleged in the Manner and Means.[52] Hence, whether based on the express language of the Manner and Means, or the §666 counts, the government clearly alleged the "bribes" were being demanded in exchange for Mr. Nelson performing official acts.

102.    As Mr. Nelson noted in his pretrial and JOA motions, the entire rationale of *Skilling* was to determine the reach of the honest services statute, so that it would not transgress compelling due process lines. To that end, the Supreme Court, in *Skilling*, stated:

> As to <u>arbitrary prosecutions</u>, we perceive no significant risk that the honest-services statute, as we **interpret it today**, will be stretched out of shape. Its prohibition on <u>bribes</u> and kickbacks draws content not only from pre-*McNally* case law, but also from <u>federal statutes</u> proscribing-and-defining-similar crimes. See, *e.g.* ... [and thereafter citing §201 and §666 and their interpretive cases – including *Ganim* and *Whitfield*].

(emphasis added).

103.    Thus, by this express language, *Skilling* <u>was</u> interpreting the honest services statute, and <u>defining</u> the elements of "bribery" that were necessary to support an honest services prosecution and hence satisfy the very due process notice concerns *Skilling* sought to resolve. In reciting the

---

[52]  Roget's International Thesaurus, Third Edition, at ¶9.10, explains that "in connection with" is synonymous with these prepositional phrases: (1) with relation to, (2) with reference to, (3) with regard to, (4) with respect to, and (5) in the matter of. Thus, all those phrases make it clear Mr. Nelson's "bribe" had to be "in the matter of" the very "official duties" charged in the Indictment.

enumerated federal bribery statutes, *Skilling* first recited §201 – for which there can be no dispute a *quid pro quo* is required. *Skilling* next recited the §666 case of *United States v. Ganim*, 510 F.3d 134, 147-149 (2nd Cir. 2007).[53] *Ganim* was an honest services mail fraud case, that expressly required a "*quid pro quo*" to support the bribery, <u>and</u> also required the bribery be paid "*in exchange for* a pattern of <u>official actions</u>." *Ganim* at 148-149 (emphasis added). Thus, when the Supreme Court in *Skilling* held their decision was designed to "interpret" the reach of honest services mail fraud relying on bribery, that very interpretation expressly relied on the holding, written by their about-to-become new colleague, Justice Sotomayor, that mandated not only (1) a *quid pro quo*, but also (2) that the bribe be directly related to "<u>official action</u>" of the defendant, in order to meet constitutional muster in a §666 prosecution. That "official action" requirement is, of course, synonymous with the requirement in *McDonnell* of "official acts" – the very element about which the jury in Nelson was never informed – notwithstanding the express *quid pro quo* and "official duties" language of the Indictment.

104.    Even though charged in its Indictment, the government opposed the jury being informed that a *quid pro quo* was required – because the government was aware they could <u>not</u> establish any such proof. Indeed, during oral argument on appeal, the government was asked by

---

[53] This opinion was written by Judge Sonya Sotomayor, now Justice Sotomayor. In his JOA motion (Doc. 306, at 43), Nelson noted that her views on this matter will likely inform future cases. Given the unanimous opinion in *McDonnell*, that prediction five years ago is now entirely correct, since, as noted herein, the *McDonnell* court has, again, required a *quid pro quo* for an honest services bribery conviction. The Second Circuit has followed both *Ganim* and *Skilling*, and held that both honest services fraud (bribery) and §666 are "proven by evidence of an illegal <u>quid pro quo</u> agreement, which we have previously defined as 'a government official's receipt of a benefit <u>in exchange</u> for an <u>act</u> he has performed, or promised to perform, in the exercise of his <u>official duties</u>.'" *United States v. Rosen*, 716 F.3d 691, 699-700 (2nd Cir. 2013)(emphasis added). Thus, "the Government must prove the defendant had 'a specific intent to give ... something of value *in exchange* for an <u>official act</u>.'" *Id* at 700 (underlined emphasis added).

Justice Hill this question: "If it turns out that a *quid pro quo* is required to violate the federal law, you did not show that in this case, did you?" The government answered, "I don't think we did, Your Honor."[54] Thus, it cannot be gainsaid that the government had no proof of the very *quid pro quo* this Court found the Indictment alleged – as it most certainly did. A proper jury instruction, requiring the government to prove what the Court found it to have alleged, would surely have resulted in either a JOA or an acquittal.

105.     However, the question asked by Justice Hill has now been further answered by the Supreme Court, holding that "Section 201 prohibits *quid pro quo* corruption – the exchange of a thing of value for an 'official act.'" *McDonnell* at 22. Respectfully, the Nelson jury should have been so instructed.[55] For the same constitutional reasons, the Nelson JOA should have been granted.

(7)   Federalism and the Florida Statutes

106.     As discussed above, one of the linchpins of the Supreme Court's due process considerations involved the Supreme Court's rejection of the government efforts to set <u>federal</u> standards of "good government for local and state officials." *McDonnell* at 24. The Supreme Court declined to allow the federal government to set the outer limits of good government, and, identifying "significant federalism concerns," noted it is the <u>state's</u> "prerogative to regulate the permissible

---

[54] Excerpts from December 12, 2102 Nelson Oral Argument. Exhibit C.

[55] Mr. Nelson respectfully requests the Court note that, even <u>if</u> a *quid pro quo* is not required in a §666 prosecution, that does not mean the holding of *McDonnell*, requiring the jury to find some form of <u>official act</u> (also meaning Nelson, as an "agent," was authorized to take such official action) does not apply with full force and effect. Even applying *McNair's quid pro quo* holding (at 1188) that "the government is not required to tie or <u>directly</u> link a benefit or payment to a specific <u>official act</u>," that does not mean the government can abandon their responsibility to prove Mr. Nelson engaged in official acts – especially when their <u>own Indictment</u> and the findings of this Court, asserted that Nelson would demand the "bribe" "in return for being influenced in the performance of his **official duties**." Indictment at 5, ¶C.2.

scope of interactions between state officials and their constituents." *Id.* at 24.  Respectfully, Mr. Nelson repeatedly sought to have that principle honored in his prosecution.  His requests were repeatedly rejected, not only in the denial of his JOA motions, but in the denial of his requests for jury instructions, so informing the jury.  Doc. 240 at 12-15 and 19-21.

107.    Pursuant to the principles of federalism set forth in *McDonnell*, Mr. Nelson should have been immune from prosecution, because he was, at all times, in compliance with Florida law that governed his position, as well as the instructions he received from the Office of General Counsel for the City of Jacksonville.

108.    The December 9, 2009 New York Times article reported the Supreme Court's criticism in *Skilling* of the government's honest services fraud prosecutions, noting that Chief Justice John G. Roberts Jr. and Justices Scalia and Breyer recited what they called a fundamental principle, that is, that the public must be able to understand what a criminal law means. "If it can't," Chief Justice Roberts said, "then the law is invalid."

109.    Here, not only could Mr. Nelson have never understood that acting as a consultant would violate the law, but, conversely, he was informed that Florida law authorized him to act precisely as he did.

110.    Thus, the federal government improperly criminalized the conduct of a state public official – that was perfectly lawful under the laws of the State of Florida.  Under *McDonnell*, that amounts to a clear constitutional defect in this prosecution, compounded, respectfully, by the failure of the jury instructions to inform the jury Nelson could lawfully do that which he was accused of, under the governing state law that established the yardstick for his conduct and interaction with constituents.

111.    This violation of *McDonnell's* reliance on the principles of federalism is compounded by the fact that, as noted, not only was Mr. Nelson <u>not</u> on notice his conduct was <u>criminal</u>, but the converse was true – he was on notice, pursuant to Florida law, and the advice of the office of General Counsel, his conduct was <u>lawful</u>.

112.    The Fifth Amendment Due Process Clause "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 351, 357 (1983).  This void-for-vagueness doctrine has two components:  (1) providing fair warning to potential violators, and (2) restricting the discretion of the police, prosecutors, and juries.

113.    The fair warning component focuses on fairness to the targeted individual.  It is a bedrock principle of criminal law that "fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)); *see, e.g., Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.  All are entitled to be informed as to what the State commands or forbids.")

114.    Here, not only was Mr. Nelson not provided "fair warning," but, as noted, he was specifically informed his conduct was entirely <u>lawful</u>, and, now, *McDonnell* also confirms his conduct was not criminal.

(8)    Application of *McDonnell* to All Counts

115.    As noted in the Introduction, all counts are subject to vacation, under *McDonnell* –

47

not just the defective mail fraud and §666 "bribery" counts.

116.    The §666 counts were designated as "bribery" counts, that required Mr. Nelson to "corruptly" "be influenced" in his capacity as an "agent," defined as "a person authorized to act" – that is, act in his official capacity, and hence engaged in performing an official act – directly analogous to the §201 "official act" element. Jury Instruction No. 16 (Doc. 333).

117.    The money laundering counts (Counts 14-24) were specifically predicated on the "Section 1341, and bribery" allegation. Indictment; Jury Instruction No. 18 (Doc. 333). Indeed, the jury was instructed they "must find [Nelson] not guilty of money laundering" "If you have found Tony Nelson not guilty of mail fraud." Jury Instruction No. 17 (Doc. 333).

118.    Similarly, the §1001 count (Count 44), is now defective, since the jurisdiction and/or materiality element of that count depended on the alleged underlying "bribery." 11th Cir. Pattern Jury Instruction (Crim.) No. 36.  However, that materiality element is defeated, for reason that Mr. Nelson, as a matter of law, was not participating in the "bribery" conduct the FBI was purporting to investigate – since it was not "bribery" at all.  Where one set of counts is "expressly tied" to the defective counts, those counts must also be reversed.  *United States v. Takhalov*, 827 F3d 1307, 1324-35 (11th Cir. July 11, 2016).  Similarly, Governor McDonnell's false statement counts were found to be defective.

119.    Hence, since every count of the Indictment was tied to the defective access "bribery" theory, all counts must be vacated.

D.    *Coram Nobis* Jurisdiction

120.    Based on the guidance of *McDonnell*, as applied to the facts of this case, Mr. Nelson

is factually innocent, entitling Mr. Nelson to habeas relief.[56] *Bousley v. United States*, 523 U.S. 614, 623, 118 S.Ct. 1604 (1998) (remanding habeas claim to provide opportunity to demonstrate actual innocence).   Moreover, even in the case of a guilty plea, an alleged procedural default in a §2255 claim (such as the limitations period) may not bar relief, "if [Petitioner] can establish that the constitutional error in his plea colloquy has probably resulted in the conviction of one who is actually innocent." *Id.* Here, given the *McDonnell* decision, the government's access theory of bribery, and this Court's jury instructions, such a conviction did not just "probably" result – it was guaranteed.

121.    Under *McDonnell*, Mr. Nelson has been convicted, based on facts not constituting a crime. As this "is a claim that he could at no time could have presented in a motion under section 2255," due to the one year limitation period, and the fact *McDonnell* was only recently decided, Mr. Nelson is entitled to pursue either coram nobis or habeas relief pursuant to 28 U.S.C. § 2241. *In re Davenport*, 147 F.3d 605, 608-12 (7th Cir. 1998). *In re Dorsainvil*, 119 F.3d 245, 251 (3rd Cir. 1997) noted,

> [i]f ... it is a "complete miscarriage of justice" to punish a defendant for an act that the law does not make criminal, thereby warranting resort to the collateral remedy afforded by § 2255, it must follow that it is the same "complete miscarriage of justice" when the AEDPA amendment to § 2255 makes that collateral remedy unavailable. In that unusual circumstance, the remedy afforded by § 2255 is "inadequate or ineffective" ... There is no reason why § 2241 would not be available under these circumstances....

122.    The writ of error *coram nobis* is used to "achieve justice," and includes errors "of the most fundamental character." *Morgan*, 346 U.S. at 511-12.  Relief by a writ of error *coram nobis* is not governed by any statute of limitations and can be applied for at any time. *Id.* at 507.

---

[56] Since Mr. Nelson served his entire sentence, that *habeas* relief is now invoked under the provisions of its sister statue, § 2241, and *coram nobis*.

123.    *Coram nobis* is available as a remedy for setting aside a <u>constitutionally infirm</u> criminal judgment, even though the sentence imposed has been served. *Hayes v United States*, 468 F. Supp. 179, 181 (S.D. Tex. 1979). The *McDonnell* decision further demonstrates the judgment in this case is "constitutionally infirm."

124.    Jurisdictional errors are "fundamental" for purposes of the writ. *See United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002) ("One type of claim that has historically been recognized as fundamental, and for which collateral relief has accordingly been available, is that of 'jurisdictional' error.")  Indeed, "the district court is without jurisdiction to accept a guilty plea to a non-offense." *Id.* at 713. Here, the jury was permitted to render a finding of guilt for an "access" bribery theory that is unconstitutional.

125.    The writ must be granted where the <u>indictment</u> and <u>jury instructions</u> resulted in conviction based on an <u>impermissible theory of liability</u>. *See Allen v. United States*, 867 F.2d 969, 972 (6th Cir 1989). That is precisely what occurred here.

126.    The writ must be granted where a retroactive change in the law rendered jury instructions to state an improper legal theory. *See U.S. v. Mandel*, 862 F.2d 1067, 1075 (4th Cir. 1988). Here, the jury instructions, found by *McDonnell* to be defective, were all the more so with Nelson's instructions.  Thus, coram nobis is the appropriate remedy to vacate Mr. Nelson's convictions, based on the unconstitutional legal theory advocated by the government and the jury instructions.

127.    Coram nobis relief is proper where, as here, the indictment is "so defective it does not, by any reasonable construction, charge an offense for which the defendant is convicted." *United States v. Santelises*, 476 F.2d 787, 788 (2d Cir. 1973); *United States v. Trollinger*, 415 F.2d 527, 528

(5th Cir. 1969). Clearly, the "access" theory of bribery is constitutionally defective.

128.    A writ of coram nobis should be granted where there has been a fundamental error of constitutional proportion. Here, at least three such fundamental errors occurred. First, Mr. Nelson was convicted on facts not constituting a crime. *See United States v. Fiola*, 1996 WL 694172 *3 (E.D. Pa. Dec. 2, 1996) ("[W]e may only grant a writ of coram nobis where there has been a fundamental error of constitutional magnitude, and a conviction based on insufficient facts would be such an error . . . . "). Second, the indictment failed to charge (and the proof failed to establish) the essential requirements of bribery, as required by *McDonnell*. A missing element from an indictment constitutes fundamental error for coram nobis relief. *See United States v. McClelland*, 941 F.2d 999, 1003 (9th Cir. 1991) ("Clearly the requirement that the Government prove beyond a reasonable doubt every element of the charged offense is of the most fundamental nature. If the government is permitted to sidestep this requirement, the error is a fundamental one and justifies the collateral relief of *coram nobis*."). Third, under Florida law, and the principles of federalism recognized by *McDonnell*, Mr. Nelson was immune from prosecution.

E.    Conclusion

129.    Mr. Nelson served both the prison and supervised release components of his sentence, but remains impaired and handicapped by the financial obligations of his judgment. Moreover, he is now a convicted felon – notwithstanding Young (in his only honest report), assuring the FBI Mr. Nelson was a "pillar of the community" – which he most certainly was. Nelson Trial Exhibit 8F. Thus, Mr. Nelson, who made tremendous contributions to our community, continues to suffer substantial adverse collateral consequences of this conviction.

130.    Aside from the procedural complexities of this Petition, the remedy requested seeks

no more than that which the laws and Constitution of this country were established to guarantee – fundamental fairness.

131.   Notwithstanding the potential embarrassment to the government, or the waste of taxpayer dollars in the prosecution of this unfortunate case, the government cannot discharge the mandate of former Attorney General Janet Reno to "do right," and oppose the granting of this Petition. However, if they will not "do right," Mr. Nelson respectfully requests the Court right the wrong of his conviction.

WHEREFORE, Tony D. Nelson respectfully requests the Court enter an order setting aside and vacating his judgment, conviction and sentence, and vacating any orders of assessments, forfeiture and/or personal money judgments.

Respectfully submitted,

**FALLGATTER & CATLIN, P.A.**

_/s/ Curtis S. Fallgatter_
Curtis S. Fallgatter, Esq.
Florida Bar Number: 0213225
200 East Forsyth Street
Jacksonville, Florida 32202
(904) 353-5800 Telephone
(904) 353-5801 Facsimile
fallgatterlaw@fallgatterlaw.com
Attorneys for Tony D. Nelson

Exhibits

A.   Orientation Manual – for JaxPort Board of Directors (Nelson Ex. 4A)
B.   Voting Conflict Form (Nelson Ex. 4A – Tab D)
C.   Oral Argument Excerpts (see at 35:14 - 35:37 on the disk)
D.   Eleventh Circuit Amicus Brief – NACDL and ACLU

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing, and the exhibits hereto, have been furnished electronically to: (1) Mac Heavener, Esq., Deputy Chief Assistant U.S. Attorney, Office of the United States Attorney, 300 N. Hogan St., Ste. 700, Jacksonville, FL 32202, and (2) Mark B. Devereaux, Esq., Assistant U.S. Attorney, Office of the United States Attorney, 300 N. Hogan St., Ste. 700, Jacksonville, FL 32202, this 15th day of November, 2016.

/s/ Curtis S. Fallgatter
ATTORNEY

70209